UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| WHEATLAND TUBE COMPANY<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, U.S. CUSTOMS AND BORDER PROTECTION, ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of Homeland Security, and CHRIS MAGNUS, in his official capacity as Commissioner, U.S. Customs and Border Protection,<br><br>      Defendant. | Ct. No. 22-cv-00004 |

**RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

_____

Roger B. Schagrin
Luke A. Meisner
Nicholas J. Birch
Benjamin J. Bay
SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 719-7000

*Counsel for Wheatland Tube Company*

Dated March 9, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

QUESTIONS PRESENTED ................................................................................. 2

STATEMENT OF FACTS .................................................................................. 2

ARGUMENT .................................................................................................... 9

  I.  LEGAL STANDARDS ............................................................................... 9

    A.  Motion To Dismiss Pursuant to USCIT R. 12(b)(1)................................ 9

    B.  Motion To Dismiss Pursuant to USCIT R. 12(b)(6).............................. 10

  II.  DEFENDANTS' MOTION RESTS UPON A FUNDAMENTALLY FLAWED INTERPRETATION OF THE STATUTE .............................. 10

    A.  Legal Standard for Statutory Construction ....................................... 12

    C.  The Plain Language of Section 1516 Shows That It Applies to Specific Designated Entries of Merchandise ..................................... 15

    D.  Customs' Own Regulations Show That Section 1516 Applies to Specific Designated Entries of Merchandise ..................................... 17

    E.  Caselaw Shows That Section 1516 Applies to Specific Designated Entries of Merchandise ................................................................... 20

    F.  The Government's Interpretation of the Statute Is Erroneous ............ 21

  III.  THIS COURT HAS JURISDICTION OVER WHEATLAND'S CLAIMS ...... 24

    A.  Legal Standard ............................................................................... 24

    B.  Customs' Treatment of Wheatland's December 2020 Request Was Deficient ......... 24

    C.  Customs' Treatment of Wheatland's January 2021 Petition Was Deficient ............. 26

  IV.  THE COURT SHOULD GRANT WHEATLAND'S PETITION FOR A WRIT OF MANDAMUS ................................................................. 30

    A.  Customs Has a Clear Duty to Respond to Wheatland .......................... 30

    B.  Wheatland Has a Clear Right to Demand the Relief Sought ................ 31

    C.  There Is No Adequate Alternative Remedy Available ......................... 32

CONCLUSION ............................................................................................... 34

CERTIFICATE OF COMPLIANCE

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227(1937).............................................................24, 25

*Amoco Oil Co. v. U.S.*, 234 F.3d 1374 (Fed. Cir. 2000) ........................................................ 10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 10

*Best Power Technology Sales Corp. v. Austin*, 984 F.2d 1172 (Fed.Cir.1993)..................... 23, 33

*Bradford Co. and U.S. v. American Lithographic Co.*, 12 Ct. Cust. Appls. 318,
  T.D. 40318 (1924)................................................................................................... 20

*Canadian Wheat Bd. v. U.S.*, 580 F.Supp.2d 1350 (Ct. Int'l Trade 2008) .................................. 9

*Cedars-Sinai Medical Ctr. V. Watkins*, 11 F.3d 1573 (Fed. Cir. 1993)......................................... 9

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ........... 12

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ..................................................................... 26

*DeCosta v. United States*, 987 F.2d 1556 (Fed.Cir.1993) ...................................................... 23, 33

*Diamond Tool Research Co., Inc. v. U.S.*, 55 Cust. Ct. 37 (Cust. Ct. Third Division 1965) ....... 13

*Duferco Steel, Inc. v. U.S.*, 403 F.Supp.2d 1281 (Ct. Int'l Trade 2005)...................................... 10

*E.C. Miller Cedar Lumber Co. v. United States,* 24 C.C.P.A. 272 (1936) ................................... 21

*Feltex Corp. v. Dutchess Hat Works*, 71 F.2d 322 (C.C.P.A. 1934) ........................................... 19

*Gazelle v. Shulkin*, 868 F.3d 1006 (Fed. Cir. 2017) ............................................................... 15

*Globe Metallurgical Inc. v. U.S.*, 530 F. Supp. 3d 1343 (Ct. Int'l Trade 2007)........................... 10

*H&H Wholesale Servs., Inc. v. U.S.*, 30 CIT 689 (2006) ........................................................... 9

*Haggar Co. v. Helvering*, 308 U.S. 389 (1940))...................................................................... 22

*Hammond Lead Prod., Inc. v. United States*, 289 F. Supp. 533 (Cust. Ct. 1968) ....................... 20

*Hitachi Home Electronics (America) Inc. v. U.S.*, 704 F.Supp.2d 1315 (Ct. Int'l Trade
  2010  ....................................................................................................................... 29, 32

*Hosiden Corp. v. Advanced Display Mfrs. of America*, 85 F.3d 1561 (Fed. Cir. 1996).............. 24

*Industrial Chemicals, Inc. v. U.S.*, 335 F. Supp. 3d 1327 (Ct. Int'l Trade 2018)........................... 9

*Kahrs Intern., Inc. v. U.S.*, 645 F. Supp. 2d 1251 (Ct. Int'l Trade 2009) .................................. 10

*Matter of N. C. Trading*, 586 F.2d 221 (C.C.P.A. 1978)......................................... 14, 15, 16, 26

*Mullins Indus. Diamond Corp. v. U.S.*, 55 Cust. Ct. 72 (Cust. Ct. Third Division 1965) ........... 13

*Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1551 (Fed. Cir. 1988).................... 29, 32, 33

*Powell v. McCormack*, 395 U.S. 486 (1969) ..................................................................... 24, 28

*Presitex USA Inc. v. U.S.*, 674 F. Supp. 3d 1371 (Ct. Int'l Trade 2010) .................................. 10

*Qingdao Barry Flooring Co. Ltd. v. United States*, 190 F.Supp.3d 1274 (Ct. Int'l Trade 2016). 27

*R&W Flammann GmbH v. U.S.*, 339 F.3d 1320 (Fed. Cir. 2003) .................................................. 26

*Rubie's Costume Company v. U.S.*, 337 F.3d 1350 (Fed. Cir. 2003) ..................................... 27, 28

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ................................................... 9

*Suntec Indus. Co. v. U.S.*, 951 F.Supp.2d 1341 (Ct. Int'l Trade 2013) ................................... 9

*Timken Co. v. Simon*, 539 F.2d 221 (D.C. Cir. 1976) .................................................... 30

*TRW Inc. v. Andrews*, 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ............................ 15

*U.S. v. Schurz*, 102 U.S. 378 (1880) ................................................................ 30

*United States v. Nat'l Starch Prod., Inc.*, 318 F.2d 737 (C.C.P.A. 1962) ................................ 20

*Wheatland Tube Company v. United States*, Slip Op. No. 22-16 (Ct. Int'l Trade 2022) .............. 9

## Statutes

18 U.S.C. § 1905 ......................................................................................... 7

19 U.S.C. § 1502 ......................................................................................... 16

19 U.S.C. § 1516 .................................................................................... passim

28 U.S.C. § 2631(j)(1)(A) ............................................................................. 32

5 U.S.C. § 706(1) ......................................................................................... 8

5 U.S.C. 552(a) ......................................................................................... 17

5 U.S.C. 552(b)(4) .................................................................................... 17

Tariff Act of 1922, ch. 356, ss 516(a)-(b), 42 Stat. 970-71 ............................................ 14

## Other Authorities

House Ways & Means Committee Report to Accompany H.R. 2667, 71st Cong., 1st Sess., May 9, 1929, at 180........................................................................................... 14

*See* Senate Finance Committee Report to Accompany H.R. 2667, 71st Cong., 1st Sess., Sept. 4, 1929, at 73........................................................................................... 29

## Regulations

19 C.F.R. § 175 ..................................................................................... passim

19 C.F.R. § 175.1 ...................................................................................... 3, 6

19 C.F.R. § 175.12 ....................................................................................... 5

19 C.F.R. § 175.21 ................................................................................... 17, 27

19 C.F.R. § 175.22(a) .................................................................................. 18

19 C.F.R. § 175.25(c) .................................................................................. 18

19 C.F.R. § 177.0 ................................................................................... 24, 32

19 C.F.R. § 177.1 ....................................................................................... 19

19 C.F.R. § 177.1(d)(1)...................................................................................................... 19

19 C.F.R. § 177.2(b)(ii) ...................................................................................................... 19

19 C.F.R. § 177.7(b) ................................................................................... 7, 24, 28, 29, 31, 32

19 C.F.R. §175.22(b) ........................................................................................................... 18

19 C.F.R. §175.23 ................................................................................................................ 18

19 C.F.R. §175.24 ................................................................................................................ 18

19 C.F.R. §175.25(a) ........................................................................................................... 18

19 C.F.R. §175.25(b) ........................................................................................................... 18

19 C.F.R. 175.22(a) ............................................................................................................. 27

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| WHEATLAND TUBE COMPANY<br><br>       Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, U.S. CUSTOMS AND BORDER PROTECTION, ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of Homeland Security, and CHRIS MAGNUS, in his official capacity as Commissioner, U.S. Customs and Border Protection,<br><br>       Defendant. | Ct. No. 21-cv-00040 |

## <u>RESPONSE IN OPPOSITION TO MOTION TO DISMISS</u>

Plaintiff Wheatland Tube Company ("Wheatland") respectfully submits this response in opposition to the motion to dismiss filed by Defendant, the United States.[1] As demonstrated below, this Court retains jurisdiction over this action because Wheatland's claims are not moot. In addition, defendant's motion to dismiss is premised on a fundamental misreading of 19 U.S.C. § 1516. When this statutory provision is properly read in light of the plain language of the provision and its legislative history, it is clear that Wheatland has stated a claim upon which relief can be granted. Indeed, the evidence that Wheatland has submitted in this proceeding establishes that Wheatland is entitled to mandamus relief. Accordingly, Wheatland respectfully requests that this Court deny Defendant's motion to dismiss and grant Wheatland's petition for a writ of mandamus.

---

[1]     Wheatland's complaint (ECF No. 4) is referenced as "Compl."; and its petition for a writ of mandamus (ECF No. 7) is referenced as "Pl. Writ." Defendant's combined motion to dismiss, response to plaintiff's motion for a preliminary injunction, and response to plaintiff's petition for a writ of mandamus (ECF No. 12) is referenced as "Def. Br."

## QUESTIONS PRESENTED

1.  Whether 19 U.S.C. § 1516's requirement that Customs furnish the classification of "designated imported merchandise" refers to the classification made by an importer of specific imports of merchandise designated by the domestic manufacturer;

2.  Whether Wheatland's action has raised live issues that cannot be dismissed on grounds of mootness;

3.  Whether Wheatland is entitled to a writ of mandamus compelling Customs to respond to its December 11, 2020 classification request and January 7, 2021 petition, because its correspondence to date has failed to meet the requirements of 19 U.S.C. § 1516.

## STATEMENT OF FACTS

On March 8, 2018, the President of the United States determined that imports of certain steel products, including steel conduit pipe classified under Harmonized Tariff Schedule ("HTS") heading 7306.30.5028, threatened to impair the national security of the United States. As a result, the President imposed 25 percent *ad valorem* tariffs on such products pursuant to section 232 of the Trade Expansion Act of 1962. *See* Plaintiff's Complaint, Jan. 12, 2022 ("Compl."), at ¶ 15. The President modified this determination on May 19, 2019, and announced an agreement (the "May 2019 Agreement") with Canada and Mexico removing the Section 232 tariffs on subject imports from these countries in exchange for a concession that:

> In the event that imports of . . . steel products surge meaningfully beyond historic volumes of trade over a period of time, with consideration of market share, the importing country may request consultations with the exporting country. After such consultations, the importing party may impose duties of 25 percent for steel . . . in respect to the individual product(s) where the surge took place.

Compl. ¶ 19. The purpose of the May 2019 Agreement, as stated in Presidential Proclamation 9894, was to "permit{} the domestic industry's capacity utilization to continue at approximately the target level recommended in the Secretary's report." Compl. ¶ 21. This agreement remains in effect.

On August 31, 2020, pursuant to the May 2019 Agreement, the United States and Mexico held consultations and agreed to establish an export licensing regime covering steel products, including steel conduit pipe classified under HTS 7306.30.5028. Compl. ¶ 22-23. This regime did not cover merchandise classified under HTS 8547.90.0020. *See id.* The regime would last until June 1, 2021 but could be reinstated pursuant to the May 2019 Agreement. *See* Compl. ¶ 23. Wheatland Tube Company ("Wheatland"), a domestic producer of steel conduit pipe, monitored publicly available import data and found evidence that two importers, Shamrock Building Materials, Inc. ("Shamrock") and Rymco U.S.A. ("Rymco"), had largely stopped classifying its imports of steel conduit pipe from Mexico under HTS 7306 in September 2020, and subsequently began classifying large amounts of the same imported pipe from Mexico under HTS 8547.90.0020 beginning in October 2020. Compl. ¶ 24-27. Wheatland determined that there was no difference in the merchandise being imported, and that the only thing that had changed was the HTS code under which the imports were classified. Compl., Exhibit 1, at 3.

Beginning in December 2020, Wheatland took action to alert Customs to this ongoing misclassification of steel conduit pipe. Wheatland's counsel first submitted two E-Allegations to Customs on December 1, 2020 and December 7, 2020. Compl. ¶ 30. On December 11, 2020, Wheatland next submitted a request for the "classification and rate of duty or export license requirement imposed upon imports of steel conduit pipe from Mexico" (the "December Request"), under 19 U.S.C. § 1516(a)(1) ("Section 1516") and 19 C.F.R. § 175.1. Compl. ¶ 31.

These provisions of the law allow domestic interested parties to request Customs to provide the classification and rate of duty under which designated imports of merchandise entered the United States. *See* 19 U.S.C. § 1516(a)(1).

Along with its request, Wheatland included data demonstrating that imports of steel conduit pipe classified under HTS 7306.30.5028 had fallen sharply between August 2020 and October 2020, and that, beginning in October 2020, imports of steel conduit pipe classified under HTS 8547.90.0020 had surged. *See* Compl., Exhibit 2. The request further included information from Panjiva, a publicly available database, demonstrating the timing and volume of Shamrock's and Rymco's shifting classification of their imports. Compl. ¶ 24-25. By requesting information regarding the classification of the merchandise, Wheatland sought to alert Customs to ongoing misclassification of steel conduit pipe in violation of the export licensing regime in place with Mexico and to ensure that the merchandise would be properly reclassified in accordance with Section 1516. Compl. ¶ 24, *see also* Compl., Exhibit 2, at 4 ("If the entries are not being properly classified, they could enter at quantities that greatly exceed any amounts agreed to in the export licensing arrangement"). The purpose of that arrangement with Mexico was to limit import surges, including goods classified under HTS 7306.30.5028, and protect domestic producers like Wheatland from injury. *See* Compl. ¶ 21, 23. Wheatland's request would aid in these efforts because it would provide definitive confirmation that steel conduit pipe imported from Mexico had entered the United States under an incorrect classification so that further steps under Section 1516 could be taken to address this problem.

On January 7, 2021, having received no response to the December Request and continuing in its belief under Section 1516(a) that "the classification or rate of duty [was] not correct" with respect to the imported steel conduit pipe, Wheatland followed the statutory

procedure and submitted a petition seeking a tariff classification ruling on imported steel conduit pipe (the "January Petition"). Compl. ¶ 32. The January Petition requested that Customs "determine that certain steel conduit pipe be properly classified under the {HTS} as 7306.30.5028," and not HTS 8547.90.0020. Compl., Exhibit 3, at 1. It repeated the basis for Wheatland's belief that Shamrock and Rymco were misclassifying their entries of steel conduit pipe from Mexico to evade the export licensing arrangement, and it provided detailed evidence per 19 C.F.R. § 175.12 that the merchandise should be properly classified under HTS chapter 7306. *See* Compl., Exhibit 3, at 3, 8. The January Petition further requested that Customs reconsider ruling NY N306508, which Customs had issued on February 21, 2020, as it conflicted with past rulings by classifying certain steel conduit pipe from Thailand under HTS 8547.90.0020. Compl., Exhibit 3, at 2.

Section 1516, as implemented in Customs' regulations at 19 C.F.R. § 175, required that Customs take specific actions upon receiving the December Request and the January Petition. In particular, Section 1516 provides that Customs, after receiving a request from an interested party, "*shall* furnish the classification and the rate of duty imposed upon designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by such interested party." 19 U.S.C. § 1516(a)(1) (emphasis added). After receiving a petition setting forth Wheatland's belief that the classification of the imported merchandise was not correct, Customs was obligated to make a determination on the issue. 19 U.S.C. § 1516(b)-(c). If Customs determines that the merchandise was misclassified, Customs "*shall* determine the proper appraised value, classification, or rate of duty and *shall* notify petitioner of {its} determination." 19 U.S.C. § 1516(b) (emphasis added). Following this determination and notification, the merchandise "*shall* be appraised, classified, or assessed as to the rate of duty in accordance with

the Secretary's determination." *Id.* (emphasis added). If, however, Customs determines that the merchandise was correctly classified, Customs "*shall* notify the petitioner," allowing the interested party to move to the next procedural step under the statute and contest that determination. 19 U.S.C. § 1516(c) (emphasis added).

Customs sent Wheatland's counsel a letter on January 22, 2021, purporting to respond to Wheatland's December Request. This letter did not "furnish the classification . . . imposed upon designated imported merchandise," as was required. 19 U.S.C. § 1516(a)(1). Rather, Customs provided the classification for a small subset of entries of steel conduit pipe imported by Shamrock between April 26, 2019 and July 19, 2019. *See* **Exhibit 1.** These entries were already the subject of a civil complaint filed by Shamrock at the Court of International Trade ("CIT") on May 20, 2020 (the "Shamrock Action"), challenging their classification under HTS heading 7306. Customs argued that because "the issue of the classification of the merchandise described above is now before the CIT . . . {it} will be adjudicated in that forum." *Id.* Customs made no mention of steel conduit pipe imported after August 31, 2020, the period during which Wheatland alleged misclassifications under HTS 8547 had resumed. Customs did not explain why it only provided the classification for imports from such a limited time period. Nor did Customs explain why the Shamrock Action had any bearing on a classification request made under Section 1516 and 19 C.F.R. § 175.1 for imports that fell outside the time period of imports at issue in the Shamrock Action.

Wheatland followed up with correspondence to Customs on February 22, 2021, reiterating that the December Request did *not* refer to the entries at issue in the Shamrock Action and repeating its request for Customs to provide the classification for the steel conduit pipe imported by Shamrock and Rymco between August 31, 2020 and the present. **Exhibit 2**, at 1-2.

Because the earlier entries at issue in the Shamrock Action had already been reclassified under HTS 7306, Customs failed to address the subsequent entries of merchandise that were misclassified under HTS 8547. Wheatland thus noted that it considered its classification request "to be still open and pending before the agency" and "respectfully request{ed} CBP to take further action on this matter." *Id.*, at 2.

On April 9, 2021, Customs wrote "in response to {Wheatland's} letter, dated February 22, 2021," laying out the following positions: (i) 18 U.S.C. § 1905 (the "Trade Secrets Act") read together with 19 U.S.C. §1516(a) prohibited Wheatland from receiving information regarding the classification of Shamrock and Rymco's entries of steel conduit pipe; (ii) "steel conduit pipe imported from Mexico, with or without interior coating, where any such coating does not have insulation properties" is classified in HTS heading 7306 regardless of the date of entry; (iii) because the classification issue was pending before the CIT in the Shamrock Action, under 19 C.F.R. § 177.7(b) Customs was precluded from reconsidering the NY N306508 ruling on the classification of steel conduit imported from Thailand. Compl., Exhibit 7, at 2-3.

Wheatland believed at this point that Customs' correspondence meant that Customs was acknowledging Shamrock and Rymco's misclassifications and would take further action pursuant to Section 1516 to stop them. Indeed, such action was legally required, because Section 1516(b) mandates that following a determination of misclassification, Customs must publish notification of its determination in the Customs Bulletin and thereafter the designated merchandise "*shall* be appraised, classified, or assessed as to the rate of duty in accordance with the Secretary's determination." 19 U.S.C. § 1516(b).

Customs did not do so. Contrary to the requirements on the agency imposed by 19 U.S.C. § 1516(b) that it thereafter classify imports according to the determination Customs claims it

made in the April 9th letter, Customs continued to allow large volumes of imports of steel

conduit pipe from Mexico to be misclassified under HTS 8547. Compl. ¶ 35. If proper

classification had occurred, these imports could have triggered consultations and the re-

instatement of the export licensing regime and/or Section 232 duties pursuant to the May 2019

Agreement – measures that were designed to protect domestic producers like Wheatland. Compl.

¶ 28. Instead, Wheatland's steel conduit pipe business has suffered and continues to suffer

increasingly serious injury due to the surge of misclassified imports, including costly plant

shutdowns, the loss of 20,000 tons of sales volume, the elimination of 16 full-time positions, and

the furloughing of over 400 employees. Compl., Exhibit 1, at 5.

On January 12, 2022, as imports of misclassified pipe continued to pour into the country

from Mexico, Wheatland concluded that Customs would never uphold its obligations under 19

U.S.C. § 1516 and initiated this action to "compel agency action unlawfully withheld or

unreasonably delayed," as provided for in the APA, 5 U.S.C. § 706(1). Specifically, Wheatland

sought: (i) a writ of mandamus directing Customs to respond to its December Request and

January Petition in the manner required by Section 1516 and to correct any misclassification of

merchandise entered into the United States under HTS 8547.90.0020; and (ii) a preliminary

injunction suspending the liquidation of any unliquidated entries of steel conduit pipe entered

into the United States under HTS 8547.90 for the pendency of the litigation and until Wheatland

receives a legally sufficient response to the December Request and January Petition. Compl. at

13. On February 23, 2022, Judge Timothy Stanceu denied Wheatland's motion for preliminary

injunctive relief but ruled that the claim, construed as an allegation that Customs "has not

responded in a way that satisfies the requirements of {Section 1516} . . . is not moot." *Wheatland*

*Tube Company v. United States*, Slip Op. No. 22-16 (Ct. Int'l Trade 2022). Wheatland therefore continues to oppose Defendant's Motion and seek mandamus relief.

## ARGUMENT

### I.   LEGAL STANDARDS

#### A.   Motion To Dismiss Pursuant to USCIT R. 12(b)(1)

To adjudicate a case, a court must have subject matter jurisdiction over the claims presented. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). When reviewing a motion to dismiss for lack of subject matter jurisdiction, the court proceeds according to whether the motion "challenges the sufficiency of the pleadings or controverts the factual allegations made in the pleadings." *H&H Wholesale Servs., Inc. v. U.S.*, 30 CIT 689, 691 (2006). When the motion challenges the sufficiency of the pleadings, the court assumes that the allegations within the complaint are true. *Id.* When "the motion controverts factual allegations supporting the {c}omplaint, 'the allegations in the complaint are not controlling,' and 'are subject to fact-finding by the {trial} court.'" *Id.* at 691-692 (quoting *Cedars-Sinai Medical Ctr. V. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).

The CIT has emphasized that it must draw all reasonable inferences in the plaintiff's favor when deciding a motion to dismiss for lack of subject matter jurisdiction. *Industrial Chemicals, Inc. v. U.S.*, 335 F.Supp.3d 1327 (Ct. Int'l Trade 2018). The CIT need only find that a "preponderance of the evidence" supports a finding of jurisdiction. *Canadian Wheat Bd. v. U.S.*, 580 F.Supp.2d 1350 (Ct. Int'l Trade 2008), *opinion clarified on denial of reconsideration*, 637 F.Supp.2d 1329 (Ct. Int'l Trade 2009), *judgment aff'd*, 641 F.3d 1344 (Fed. Cir. 2011). The CIT may review evidence extrinsic to the pleadings in resolving Rule 12(b)(1) motions. *Suntec Indus. Co. v. U.S.*, 951 F.Supp.2d 1341, 1345 (Ct. Int'l Trade 2013), *aff'd*, 857 F.3d 1363 (Fed.

9

Cir. 2017). Moreover, in considering Rule 12(b)(1) motions, the CIT must "limit its inquiry to the jurisdictional question, and avoid examining the merits of a case." *Duferco Steel, Inc. v. U.S.*, 403 F.Supp.2d 1281, 1284 (Ct. Int'l Trade 2005).

### B.   Motion To Dismiss Pursuant to USCIT R. 12(b)(6)

When reviewing a motion to dismiss for failure to state a claim, "any factual allegations in the complaint are assumed to be true and all inferences are drawn in favor of the plaintiff." *Amoco Oil Co. v. U.S.*, 234 F.3d 1374, 1376 (Fed. Cir. 2000). A court may properly dismiss a case under Rule 12(b)(6) only if the plaintiff's allegations of fact are not "enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citations omitted). A claim that states a "plausible claim for relief" will survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The CIT has further emphasized that the complaint should not be dismissed unless it appears "beyond doubt that the plaintiff can prove no set of facts" in support of his or her claim that would entitle him or her to relief, *Globe Metallurgical Inc. v. U.S.*, 530 F.Supp.3d 1343, 1345 (Ct. Int'l Trade 2007), and that all well-pled factual allegations are assumed to be true and all reasonable inferences are to be construed in favor of the non-movant. *Presitex USA Inc. v. U.S.*, 674 F.Supp.3d 1371, 1376 (Ct. Int'l Trade 2010); *Kahrs Intern., Inc. v. U.S.*, 645 F.Supp.2d 1251, 1262 (Ct. Int'l Trade 2009).

### II.    DEFENDANTS' MOTION RESTS UPON A FUNDAMENTALLY FLAWED INTERPRETATION OF THE STATUTE

Requests for information and the filing of petitions by domestic manufacturers regarding the proper classification of imported merchandise are governed by 19 U.S.C. § 1516, which provides as follows:

> The Secretary shall, upon written request by an interested party furnish the classification and the rate of duty imposed upon designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by such interested party. If the interested party believes that the appraised value, the classification, or rate of duty is not correct, it may file a petition with the Secretary . . . .

Under the plain language of this statutory provision, domestic manufacturers are permitted to request information from Custom as to how specific entries of merchandise (*i.e.*, "designated imported merchandise") have been classified by an importer. After receiving information from Customs regarding how the designated imported merchandise was classified by the importer, if the domestic manufacturer believes the merchandise was misclassified, it may file a petition with Customs to address the problem. The filing of the petition begins a process that ultimately results in improperly classified merchandise being classified under the correct HTS heading. This reading of the statute is consistent with its plain language, its purpose, its legislative history, and caselaw interpreting and discussing the statute.

According to the Government, however, Section 1516 does not give domestic manufacturers the right to request information regarding the classification by an importer of "designated imported merchandise." Rather, it only gives domestic manufacturers the right to request Customs' "position" as to the correct classification of hypothetical imports based on a general description of the imports. In the Government's view, if the domestic manufacturer believes that Customs' position as to the appropriate classification is correct, that ends the matter. On the other hand, the Government posits, if the domestic manufacturer believes that Customs' position is incorrect, it may take further action by filing a petition with Customs.[2] This

---

[2] For the purpose of ruling on Wheatland's motion for a preliminary injunction, the Court largely adopted the Government's interpretation of the statute and, as a result, found that Wheatland "is unlikely to succeed in showing that it has brought a claim on which relief can be granted." *Wheatland*, Slip Op. No. 22-16 at 16-18. However, because the Court was ruling on what was "likely" to be the correct interpretation of the statute, it did not reach definitive findings as to the correct interpretation of the statute. *See id.*

is not how the statute works. Indeed, as demonstrated below, the Government's interpretation is fundamentally flawed because it is inconsistent with the plain language of the statute, it is contrary to Congressional intent as expressed in the legislative history of the statute, and it is undermined by prior court cases addressing the rights that Section 1516 grants to domestic manufacturers seeking to ensure that specific entries of merchandise are correctly classified.

### A.   Legal Standard for Statutory Construction

The Court analyzes an agency's interpretation of a statute using the framework under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, the Court begins by using the ordinary tools of statutory construction to determine whether Congress's intent is clear regarding the precise question at issue. *Id.* at 842–43, 843 n. 9. These tools include the statute's text and structure, canons of statutory construction, and legislative history. *Gilead Scis., Inc. v. Lee*, 778 F.3d 1341, 1348 (Fed. Cir. 2015). If Congress's intent is clear, the Court must give effect to Congress's unambiguously expressed intent. *Chevron*, 467 U.S. at 842–43. However, if that intent is not clear, then the Court determines whether the agency's interpretation of the statute is a reasonable one. *Id.* at 842–44.

### B.   The Legislative History of Section 1516 Shows That It Applies to Specific Designated Entries of Merchandise

As the U.S. Supreme Court recognized over a century ago, "{t}here have always been remedies by which an *importer* may recover an excess rate of duty exacted from him by a customs collector, either by common law action against the collector." *Louisiana v. McAdoo*, 234 U.S. 627, 632 (1914) (emphasis added). But for most of the nation's history, if there was evidence that an importer was misclassifying merchandise or paying a rate of duty that was too low, there was no remedy for a domestic manufacturer of similar merchandise. In the Tariff Act of 1922, Congress provided just such a remedy:

Congress established a clear administrative process through which domestic industry could object to the importation of merchandise at specific tariff levels, 19 U.S.C. § 1516, and through which the Court of International Trade could review protests by domestic industry that were not sustained by the Secretary, 28 U.S.C. § 1581(b). This was done in the precursors of the present law after *Louisiana v. McAdoo*, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506 (1914), had established and applied to Customs duties the general rule that no one can have standing to litigate the application of a tax to another. Congress felt an exception was needed for the case of a domestic industry injured by competition of imports on which lawful duty was not collected.

*Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1551 (Fed. Cir. 1988). Congress provided this remedy because it recognized that domestic manufacturers have an interest in the proper classification and assessment of duties for imported goods, due to the improper competition they may face from imported merchandise that has been misclassified. *See, e.g.,* Senate Finance Committee Report to Accompany H.R. 2667, 71st Cong., 1st Sess., Sept. 4, 1929, at 73 ("{I}t is obvious that proper protection will not prevail unless the rate schedules are strictly and effectively enforced by the courts. It follows that American industry and American labor are equally concerned with the very important administrative sections of a tariff act . . . Section 516 for the first time recognized that the American producer has an interest in appraisement and classification of imported merchandise."); *Diamond Tool Research Co., Inc. v. U.S.*, 55 Cust. Ct. 37, 44 (Cust. Ct. Third Division 1965) ("It is palpably clear from the legislative history of the statute in question that in its enactment into law Congress was concerned with *domestic merchandise in channels of commerce in this country*, and with the competition such merchandise faced from like merchandise imported into this country from foreign countries." (emphasis in original)); *Mullins Indus. Diamond Corp. v. U.S.*, 55 Cust. Ct. 72, 73 (Cust. Ct. Third Division 1965) ("As revealed in its legislative history, section 1516 was designed to assist wholesalers of domestically produced merchandise to intervene in and influence the administration of tariff levies on foreign imports competitive with domestic merchandise{.}").

13

The U.S. Court of Customs and Patent Appeal ("CCPA") aptly summarized how the basic purpose of Section 1516 is to allow domestic manufacturers to challenge the classification of specific entries of merchandise, while giving the importer of those specific entries the right to participate in the proceeding and protecting the disclosure of confidential information:

> Section 516, which first appeared in the Tariff Act of 1922, is unique in its authorization of intervention in a proceeding in the Customs Court. Under the 1922 act, section 516 permitted a domestic manufacturer to challenge the appraised value, the classification, or the rate of duty of imported merchandise of the kind manufactured by him. When dissatisfied with the action taken by the appraiser or the Secretary, the domestic manufacturer could, under appropriate circumstances, file either an appeal for reappraisement or a protest in connection with a specific entry. Tariff Act of 1922, ch. 356, ss 516(a)-(b), 42 Stat. 970-71. The consignee of the merchandise on the entry involved in the appeal or protest filed by the domestic manufacturer was given the concomitant right to be notified of such action and to appear as a party in interest. *Id.*, s 516(c), 42 Stat. 971. Moreover, the consignee's right to prevent the confidential information contained in the entry papers from being disclosed to the domestic manufacturer was recognized. *Id.*, s 516(d), 42 Stat. 971.

*Matter of N. C. Trading*, 586 F.2d 221, 226 (C.C.P.A. 1978).

As Section 1516 was amended over the years, Congress has always made clear that the Section 1516 was a remedy for specific imports of merchandise by specific importers. In 1929, when Congress was emphasizing that Section 156 was the exclusive remedy for domestic manufacturers aggrieved by the misclassification of imported merchandise, it noted that the remedy applied to specific importations by specific importers:

> The effect of {section 1516} is to give the American manufacturer, producer, or wholesaler the opportunity and the right to protest against any or all importations by any importer or importers. The importers, on the other hand, have no notice that such protest may be made as to their importations until after their merchandise has arrived in the United States, has been entered, and the entries liquidated. It is believed that an importer should be to some extent protected in his reliance upon an existing practice or an interpretation of the law by the Government.

House Ways & Means Committee Report to Accompany H.R. 2667, 71st Cong., 1st Sess., May 9, 1929, at 180. In fact, the CCPA recognized that despite various amendments to Section 1516, the domestic manufacturers' right was always focused on challenging the classification of a specific entry of merchandise:

> "Minor changes were made to section 516 prior to the Trade Act of 1974," such as the right of the domestic manufacturer to contest the appraised value or classification of, or rate or duty assessed upon, the merchandise being carried over in section 516(c), but "as in the previous statutes, *this right was limited to the merchandise of a designated entry*."

*Matter of N. C. Trading*, 586 F.2d 221, 226 (C.C.P.A. 1978) (emphasis added).

## C.   The Plain Language of Section 1516 Shows That It Applies to Specific Designated Entries of Merchandise

The plain language of Section 1516 admits of only one interpretation – *i.e.,* that it applies to requests for information and challenges pertaining to the classification of specific entries of merchandise. First, Section 1516 states that domestic interested parties can request that Customs furnish "the classification and the rate of duty imposed upon ***designated imported merchandise***." 19 U.S.C. § 1516(a) (emphasis added). Statutes are to be interpreted to avoid rendering any provision superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). Congress's use of the term "designated" shows that requests for information under Section 1516 pertain to the actual classification of specific entries of merchandise — not to Customs' position on the classification

of hypothetical imports based on a general description of the imports. Interpreting the statute any other way renders the term "designated" as superfluous, void, and insignificant.[3]

Furthermore, if the domestic manufacturer believes that "designated imported merchandise" has been classified incorrectly and files a petition with Customs to address this problem, the agency must issue a determination regarding the classification notify the petitioner of its determination. *Id.* § 1516(b). If the domestic manufacturer is dissatisfied with this determination, it may file a notice with Customs that it desires to contest the classification of the merchandise. *Id.* § 1516(c). At that point, Customs must furnish the domestic manufacturer "with such information as to ***the entries and consignees of such merchandise***, … at such ports of entry designated by the petitioner in his notice of desire to contest, as will enable the petitioner to contest the … classification … imposed upon such merchandise ***in the liquidation of one such entry*** at such port." *Id.* (emphasis added). There cannot be "entries," "consignees," or "liquidation" of hypothetical future imports of merchandise. These terms only apply to actual imports of merchandise that have already taken place.

The fact that Section 1516 is intended for specific imports of merchandise is also reflected in 19 U.S.C. § 1516(e), which states that, when Customs' proceedings are challenged in court, "{t}he consignee or his agent shall have the right to appear and to be heard as a party in interest before the United States Court of International Trade." Of course, the fact that there is a consignee of the merchandise implies that the proceedings involve specific imports of

---

[3]   "In the absence of an express definition, we presume that Congress intended to give those words their plain and ordinary meanings." *Gazelle v. Shulkin*, 868 F.3d 1006, 1010–11 (Fed. Cir. 2017). The *Cambridge Dictionary* defines the term "designate" as "to choose someone or something for a special job or purpose" and provides as an example of the use of the term that "the president *designates* his or her successor." *See Cambridge Dictionary*, available at https://dictionary.cambridge.org (emphasis added). When the president designates a successor, he does not provide a general description of who the person will be. The president picks a specific person to the be successor.

16

merchandise that have entered the United States. Significantly, the CCPA has held that "{o}nly a consignee of the merchandise of the entry involved has a right to participate as a party in interest. Indeed, if any other consignee were allowed to become a party in interest, such a change would have radically altered the very nature of a proceeding under section 516." *Matter of N. C. Trading*, 586 F.2d 221, 230 (C.C.P.A. 1978).

The statutory language used for Section 1516 contrasts starkly with the language used for classification rulings by importers under Section 1502. In particular, Section 1502 discusses "binding rulings prior to the entry of the merchandise concerned." 19 U.S.C. § 1502. If Congress had intended for Section 1516 to apply to hypothetical imports of merchandise that have not yet entered the United States, it knew how to use language that would convey this intent.

### D. <u>Customs' Own Regulations Show That Section 1516 Applies to Specific Designated Entries of Merchandise</u>

Customs has implemented Section 1516 at part 175 of its regulations, which set forth the procedures for requests by domestic manufacturers regarding "the classification and rate of duty applicable to designated imported merchandise, and to petitions alleging that the appraised value is too low, that the classification is not correct, or that the proper rate of duty is not being assessed upon designated imported merchandise…." 19 C.F.R. § 175.0. This includes specific procedure following the filing of a petition:

> **(a) Notice of filing of petition.** Upon the filing of a petition, a notice shall be published in the Federal Register setting forth that a petition has been filed by a domestic interested party, identifying the merchandise which is the subject of the petition, and ***its present and claimed appraised value or classification or rate of duty***. The notice shall invite interested persons to make such written submissions as they desire within such time as is specified in the notice.
> **(b) Inspection of petition; inspection of documents and papers.** The petition filed by a domestic interested party will be made available for inspection by interested parties in accordance with the provisions of 5 U.S.C. 552(a). However, ***neither a petitioner nor other interested parties will in any case be permitted to***

>*inspect documents or papers of the importer of record which are exempted from*
>*disclosure by 5 U.S.C. 552(b)(4)*. . . .

19 C.F.R. § 175.21. These regulations reference "the present and claimed appraised value or

classification or rate of duty" of imported merchandise – implying that the regulations apply to

merchandise that an importer has already imported and has made claims with respect to the

proper classification of the merchandise. Furthermore, by clarifying that no party may inspect

certain confidential information of the importer of record for the merchandise underlying the

petition, Customs also clarifies that there is, in fact, an importer of record for the designated

imported merchandise.

Under the regulations, if Customs finds that the classification of imported merchandise

subject to the petition was incorrect, the agency must inform the petitioner and cause the proper

classification to be published in the Federal Register and weekly Customs Bulletin. *Id.* §

175.22(a). If Customs finds that the classification of the imported merchandise which is the

subject of the petition was correct, then the agency shall notify the petitioner but not publish its

decision. *Id* § 175.22(b). If the petitioner is dissatisfied with Custom's decision that the

"classification … is correct for the merchandise which was the subject of the petition," the

petitioner may file a notice to contest the classification of the imported merchandise that must

"designate the port or ports at which such merchandise is being imported into the United States,

and at which the petitioner desires to protest. *Id* § 175.23. Customs must then publish a notice of

the petitioner's desire to contest Customs' decision that the imported merchandise was correctly

classified. *Id* §175.24. At that point, Customs must make available to the petitioner "{a}ll

information secured by the director of the port designated by the petitioner in his notice of desire

to contest as to the character and description of merchandise of the kind covered by the petition

and entered after publication by the Commissioner of Customs of his decision as to the proper …

classification." *Id* § 175.25(a). In addition, "***samples of such merchandise***, shall be made available to the petitioner upon application by him to the port director." *Id.* (emphasis added). Furthermore, Customs must notify the petitioner of "liquidation of the ***first of the entries*** to be liquidated which would enable the petitioner to present the issue desired." *Id* § 175.25(b). If the information and the sample provided for the first entry in question do not sufficiently frame the issue presented in the petition, then Customs will notify the petitioner of "the first liquidation thereafter" which does frame the question. *Id.* § 175.25(c).

In contrast to these regulations implementing Section 1516, which focus on specific imports of merchandise that have entered the United states, Customs' implementing regulations for Section 1502 expressly discuss the issuance of rulings for a "transaction prior to its consummation" and emphasize that "a ruling may be requested under the provisions of this part only with respect to prospective transaction—that is, transactions which are not already pending before a Customs Service office by reasons of arrival, entry, or otherwise." 19 C.F.R. § 177.1. Instead of Customs determining the proper classification of "designated imported merchandise"—as in the case of a request made by a domestic manufacturer under Part 175— Customs issues a ruling "that interprets and applies the provisions of the Customs and related laws to *a specific set of facts*." *Id.* § 177.1(d)(1). Thus, Customs' regulations require that a request for a ruling under Section 1502 must include "a full and complete description of the article and whenever germane to the proper classification of the article, information as to the article's chief use in the United States, its commercial, common, or technical designation, and, where the article is composed of two or more materials, the relative quantity (by weight and by volume) and value of each." *Id.* § 177.2(b)(ii). These stringent requirements for describing merchandise are not present in the regulations for requests under Section 1516.

**E.  Caselaw Shows That Section 1516 Applies to Specific Designated Entries of Merchandise**

Since it was first enacted into law in 1922, caselaw discussing Section 1516 also shows that it applies to specific imports of merchandise. *See, e.g., Feltex Corp. v. Dutchess Hat Works*, 71 F.2d 322, 327 (C.C.P.A. 1934) ("{W}e are convinced that {the legislative history} shows that Congress did intend that an American manufacturer upon compliance with the provisions of said section 516(b), might protest the rate of duty assessed against importations to the same extent, so far as judicial review is concerned, as an importer might do under the provisions of section 514 (19 USCA 1514), providing for protests by importers against decisions of the collector."); *United States v. Nat'l Starch Prod., Inc.*, 318 F.2d 737, 738 (C.C.P.A. 1962) (discussing case where American manufacturer protested classification of specific imports of particleboard by a particular U.S. importer); *Hammond Lead Prod., Inc. v. United States*, 289 F. Supp. 533 (Cust. Ct. 1968) (denying motion to dismiss protest by domestic manufacturer challenging finding that no bounty or grant had been paid or bestowed by Mexican government upon certain litharge manufactured in Mexico and imported into the United States such that a duty equal to the amount of the bounty had to be paid upon its importation).

In *Bradford Co. and U.S. v. American Lithographic Co.*, a domestic manufacturer protested the failure of the Secretary of the Treasury to impose an additional duty equal to 10 percent of the appraised value of specific imports of merchandise because it was not marked, stamped, branded or labeled so as to indicate the country of origin as required by section 304(a) of the Tariff Act of 1922. 12 Ct. Cust. Appls. 318 (1924). The appeals court affirmed the "the determination by the collector that the merchandise was, or was not, lawfully marked, as required by section 304(a), supra, involved classification of the merchandise, and that the additional duty of 10 per cent of the appraised value of merchandise classified as not legally

marked, provided for in section 304(a), is a rate of duty within the meaning of the provisions of section 516(b) of the act of 1922, granting to an American manufacturer, producer, or wholesaler, of the class or kind of the imported merchandise, the right to protest the classification of merchandise and the rate of duty assessed by the collector…." *Id.* at 320-321.

In *E.C. Miller Cedar Lumber Co. v. United States*, a domestic manufacturer protested the manner in which Customs determined the "board measure" of specific imports of lumber, claiming that Customs used the wrong formula, and, as a result, assessed duty on a smaller quantum of lumber than the statute contemplated. 24 C.C.P.A. 272, 274-75 (1936). I CCPA held that the manufacturer's protest was invalid – not because it involved specific imports of merchandise – but because Section 1516 only gave the manufacturer the right to protest the "classification" or "rate of duty" of the imported merchandise and not the manner in which Customs decided the weights, measures, and quantities of imported merchandise in calculating the total duty assessed. *Id.* at 282.

In all these cases, the courts have treated Section 1516 and requests and petitions brought under it as applying to specific imports by actual importers, not as applying only to Customs' general views on possible future imports.

## F. The Government's Interpretation of the Statute Is Erroneous

In its request for information regarding the classification of designated imported merchandise under, consistent with Section 1516 and with Customs' implementing regulations, Wheatland posed the following two question to Customs:

(1)   Under what classification have Shamrock's imports of steel conduit pipe been entered since August 31, 2020 to the present?

(2)   Under what tariff classification have RYMCO USA's imports of steel conduit pipe been entered since August 31, 2020 to the present?

Letter to Customs (Feb. 22, 2021) (Def.'s Mot. App. A4). The Government states that Customs provided a response to Wheatland under the statute when it stated that "to the extent Wheatland has sought information on certain designated imported merchandise," Customs' own "***position*** is that the merchandise is classified in heading 7306, HTSUS, irrespective of the date of entry." Def. Br. at 22 (emphasis added). However, this response is not what the statute required of Customs. Wheatland was seeking was information from Customs that would confirm its belief that both Shamrock and RYMCO USA were misclassifying their imports under HTS 8547 instead of correctly classifying the imports under HTS 7306. This confirmation would allow Wheatland to file a petition that would begin the process of correcting this misclassification. Wheatland was not interested in simply receiving Customs' "position" as to the correct classification of hypothetical imports of steel conduit that has not been electrically insulated.

The Government also fundamentally misinterprets the statute when it states that the "portion of Section 1516(a)(1) governing petitions is not implicated by the facts of this case" as "Wheatland had no basis to argue that Customs' classification and rate of duty on any designated imported merchandise was 'not correct,' because Wheatland agreed with Customs' classification." Def. Br. at 22. As discussed above, the "classification" referenced in Section 1516 is not Customs' "position" of the correct classification based on a general description of merchandise. The "classification" referenced in Section 1516 is the classification by specific importers of designated imports of merchandise that has already entered the United States. While Wheatland may agree with Customs' "position" regarding the classification of hypothetical imports of steel conduit, it vehemently disagrees with Shamrock's and RYMCO USA's suspected misclassification of their specific imports of steel conduit.

As established above, the Government's interpretation of Section 1516 should be invalidated under the first step of the *Chevron* analysis because it is contrary to the plain language of the statute, its legislative history, Commerce's own implementing regulations, and prior case law. But even assuming that the statute was ambiguous, Customs' interpretation should be invalidated under the second step of *Chevron* because it "'contravenes clearly discernible legislative intent' or is otherwise unreasonable." *DeCosta v. United States*, 987 F.2d 1556, 1558 (Fed.Cir.1993) (citations omitted). In this regard, the Federal Circuit has emphasized that "{a}ll statutes must be construed in light of their purpose. A reading of them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and legislative purpose." *Best Power Technology Sales Corp. v. Austin*, 984 F.2d 1172, 1175–76 (Fed.Cir.1993) (quoting *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940)).

Customs' proffered interpretation of the statute clearly contravenes legislative intent and leads to absurd results. In enacting Section 1516, Congress intended to provide domestic manufacturers with a remedy to address importers that were misclassifying their imports of merchandise. Congress specifically recognized that misclassification can lead to the incorrect rates of duty being imposed, which can alter the competitive landscape in the U.S. market in a way that harms domestic manufacturers. Under Customs' interpretation of Section 1516, when an importer is misclassifying merchandise and a domestic manufacturer seeks to address this problem using Section 1516, Customs fulfills its responsibilities by simply stating its "position" that it agrees with the domestic manufacturer and, by stating its agreement, forecloses the possibility of any other action being taken – including the filing of a petition or a subsequent protest of specific entries of merchandise by the importer. That is not the remedy that Congress

provided to domestic manufacturers aggrieved by the misclassification of imports of merchandise. Indeed, Customs' interpretation of Section 1516 leads to the absurd result – as exemplified in this case – where the domestic manufacturer is completely deprived of any remedy under Section 1516 and misclassification continues unabated, rendering Section 1516 altogether meaningless.

### III.   THIS COURT HAS JURISDICTION OVER WHEATLAND'S CLAIMS

#### A.   Legal Standard

The court lacks subject matter jurisdiction over an action for mootness "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). In order to escape dismissal for mootness, the issue raised "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937). In deciding whether an issue is moot, the court "determine{s} the prospect that a decision on the issue would affect any party, and whether the issue is within the court's discretion." *Hosiden Corp. v. Advanced Display Mfrs. of America*, 85 F.3d 1561, 1566 (Fed. Cir. 1996).

#### B.   Customs' Treatment of Wheatland's December 2020 Request Was Deficient

The Government claims that "{b}ecause Customs has already responded to Wheatland's classification requests, Wheatland's requests for relief are moot." Def. Br. at 16. Customs specifically alleges that it "responded to {the December Request}" on January 22, 2021 because it "informed Wheatland that it had liquidated entries of certain steel conduit pipe under the tariff classification code advocated by Wheatland, and that it was defending those liquidations in this Court in the *Shamrock* case." Def. Br. at 17-18.

However, this limited response failed to conform to the requirements of Section 1516, which requires Customs to "furnish the classification and the rate of duty imposed upon *designated imported merchandise*" (emphasis added). Wheatland's December Request designated merchandise that was imported after August 31, 2020, when misclassifications under HTS 8547 surged. Compl., Exhibit 2, at 3-4. Yet Customs' response furnished the classification of entries made between April 26, 2019 and July 19, 2019, refusing to furnish the classification of the vast majority of the designated imported merchandise. *See* **Exhibit 1.**

Customs' argument that the classification issue will be resolved by the CIT in the Shamrock Action is meritless and should be rejected. While 19 C.F.R. § 177.7(b) provides that "{n}o ruling letter will be issued with respect to any issue which is pending before the United States Court of International Trade," this has no bearing on Customs' legal duty to furnish the classification of designated merchandise in response to a request made under 19 U.S.C. § 1516 and 19 C.F.R. § 175. *See* 19 C.F.R. § 177.0 ("{T}he rulings requested under the provisions of this part should be distinguished from the administrative rulings, determinations, or decisions which may be requested under procedures set forth elsewhere in this chapter, including . . . part 175."). Customs failed to furnish the classification of the designated merchandise, and so Customs' alleged "response" was no response at all.

To the extent Customs disagrees with Wheatland's statement of Customs' unfulfilled duties under Section 1516 when furnishing a classification, this is a "real and substantial controversy admitting of specific relief through a decree of a conclusive character." *Aetna*, 300 U.S. 227, at 241. It would thus be improper to dispose of Wheatland's claims through a motion to dismiss.

**C.  Customs' Treatment of Wheatland's January 2021 Petition Was Deficient**

The Court should also reject Customs' theory that Wheatland had no statutory basis to prepare the January Petition "because there was no disagreement between Customs and Wheatland as to the classification and rate of duty of the designated merchandise." Def. Br. at 18. According to Defendant, Section 1516(a)(1) permits petitions only "*if* the interested party believes that the appraised value, the classification, or rate of duty is *not correct*{.}" *Id.* (emphasis in original). The Government proposes that, because both Wheatland and Customs agree on how imports of steel conduit ought to be classified, Customs had "no corresponding obligation . . . {to} respond" to the January Petition, leaving "no live case or controversy" to save Wheatland's action from dismissal for mootness. Def. Br. at 19.

Yet Wheatland did – and does – disagree with the classification of the designated imported merchandise, which continues to be misclassified under HTS 8547. On February 22, 2021, Wheatland alerted Customs to the deficiency of its response to the December Request, reiterating that the December Request "covers entries of steel conduit pipe made by Shamrock and RYMCO USA after August 31, 2020{.}" **Exhibit 2**, at 1. Customs replied to Wheatland's February letter on April 9, 2021, arguing firstly that it was prohibited under the Trade Secrets Act from furnishing the classification for Shamrock and Rymco's entries. Compl., Exhibit 7, at 2. That argument would read away Section 1516's requirement that interested parties request the classification only of "designated imported merchandise" – *i.e.*, specific entries that have necessarily been classified by a specific importer. *See, e.g., Matter of N.C. Trading,* 586 F.2d 221, 226 (C.C.P.A. 1978) ("{S}ection 516 permitted a domestic manufacturer to challenge the appraised value . . . {and} file a protest *in connection with a specific entry*") (emphasis added). The Trade Secrets Act cannot be interpreted to invalidate other of Congress's statutes. *See*, *e.g.*,

*R&W Flammann GmbH v. U.S.*, 339 F.3d 1320, 1323 (Fed. Cir. 2003) ("{Defendant} did not violate the Trade Secrets Act because {the Freedom of Information Act}, also approved by Congress, logically authorizes release of information already within the public domain."). That is because the Trade Secrets Act prohibits only those disclosures "not authorized by law" (18 U.S.C.A. § 1905) and Section 1516, a duly enacted statute conferring substantive rights on domestic producers, is such an authorization.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 300-03 (1979) (finding that such authorization is provided by a congressional grant of legislative authority that affects individual rights and obligations).

Customs next attempted to cure its failure to furnish a classification for the merchandise designated in the January Petition by advising Wheatland of its position that "steel conduit pipe imported from Mexico, with or without interior coating, where any such coating does not have insulation properties . . . is classified in heading 7306, HTSUS, irrespective of the date of entry." Compl., Exhibit 7, at 2. But this general position regarding hypothetical imports of merchandise told Wheatland nothing about the actual classification of Shamrock and Rymco's entries, which Wheatland believes have continued to be misclassified under HTS 8547. Compl. ¶ 35.

Customs' single-sentence "position" manifestly failed to conform to Customs' duties under 19 U.S.C. § 1516(b) and 19 C.F.R. § 175 after receiving a petition – as should be expected, since Customs was operating under the mistaken belief that it had "no . . . obligation {to} respond" to the petition. Def. Br. at 19. Following receipt of the petition, 19 C.F.R. § 175.21 mandates that "a notice *shall* be published in the Federal Register" which "*shall* invite interested persons to make . . . written submissions" (emphasis added). *See Rubie's Costume Company v. U.S.*, 337 F.3d 1350, 1352 (Fed. Cir. 2003) ("Customs published a notice of receipt of Rubie's petition and solicited written comments regarding the petition from interested parties."). If, as

27

Customs claimed, the steel conduit pipe was properly classified under HTS 7306 and *not* HTS 8547, Customs was required to "cause the proper value, classification, or rate of duty to be published in the Federal Register" after which the merchandise "*shall* be appraised, classified, or assessed as to rate of duty in accordance with the published decision." 19 C.F.R. 175.22(a) (emphasis added).

None of that occurred, and misclassification of the merchandise under HTS 8547 remains ongoing, rendering the Government's argument that there is "no disagreement between Customs and Wheatland as to the classification and rate of duty of the designated imported merchandise" an absurdity and leaving open a "corresponding obligation that Customs respond" to the January Petition. Def. Br. at 18-19. Far from being moot, Customs' ongoing failure to perform its statutory duties represents a "live" issue in which Wheatland has a "legally cognizable" interest. *See Powell*, 395 U.S. at 496.

Defendant relies on *Qingdao Barry Flooring Co. Ltd. v. United States*, 190 F.Supp.3d 1274 (Ct. Int'l Trade 2016) for the proposition that mandamus actions contesting "how" the requested agency action was performed rather than "whether" it was performed are moot. Def. Br. at 20. Yet whether the required agency action was performed is precisely what Wheatland contests: Customs conducted no proceeding, made no determination, solicited no comment, published no ruling, and appraised no merchandise in accordance with a decision. *See Rubie's Costume Company*, 337 F.3d, at 1352-53. Because the legally required response to the January Petition never came – and indeed, because Customs argues it has no obligation to provide it – Wheatland continues to seek this statutorily mandated agency action.

Defendant finally argues that it has already responded to Wheatland's request contained within the January Petition to reconsider the ruling in NY N306508, which classified certain

28

steel conduit pipe from Thailand under HTS 8547. Def. Br. at 19. In its April 9, 2021 letter, Customs informed Wheatland that 19 C.F.R. § 177.7(b) mandates that no ruling letters be issued with respect to issues pending before the CIT, and "{a}s we stated in our letter, dated January 22, 2021, the issue of the classification of steel conduit pipe is currently before the CIT {in the Shamrock Action}." *Id.* But this issue, like the other issues Wheatland raises, remains live. Firstly, NY N306508 was a ruling made in response to a classification request from an unrelated party, designating merchandise described as "EMT/UL797 white conduit tubing . . . made up of steel with an exterior coating of zinc and an interior coating of stoved epoxy resin." **Exhibit 3**. Because this description differs in multiple ways from the designated merchandise at issue in the Shamrock Action (*see* **Exhibit 4**, at ¶ 8-12), whether the resolution of the Shamrock Action will indeed resolve the classification of the merchandise designated in NY N306508 is a factual question inappropriate for this stage of the proceedings.

Secondly, and more fundamentally, it is unreasonable to interpret 19 C.F.R. § 177.7(b) to preclude rulings even where the party seeking the ruling is different from the party that brought the CIT action. This problem was raised by the CIT in *Hitachi Home Electronics (America) Inc. v. U.S.*, 704 F.Supp.2d 1315, n.2 (Ct. Int'l Trade 2010), which stated:

> Interpreting {19 C.F.R. § 177.7(b)} broadly, Customs has developed an administrative practice of declining to rule on any protest involving an issue in a pending case before this Court, even if the protesting party is not one of the parties to the court case . . . The court need not evaluate the validity of this practice at this time, but it may be appropriate for Customs to reevaluate its practice at some point to prevent unnecessary delay in the disposition of protests by importers who do not have cases pending before the court.

Indeed, if the court interpreted the regulation in the manner Customs urges, Shamrock would be incentivized to drag out the proceedings in order to prevent domestic producers from correcting ongoing misclassifications – a strategy in which Shamrock is currently engaged. *See* Compl. ¶

35. Such an interpretation is also contrary to the legislative intent behind Section 1516, which was drafted to give domestic importers an effective and exclusive remedy to correct misclassifications. *See* Senate Finance Committee Report to Accompany H.R. 2667, 71st Cong., 1st Sess., Sept. 4, 1929, at 73 ("{I}t is obvious that proper protection will not prevail unless the rate schedules are strictly and effectively enforced by the courts"); *Nat'l Corn Growers Ass'n*, 840 F.2d at 1553-54 ("The committee established that importers and domestic producers deserved certainty in the conduct of their affairs, a certainty which was the overriding policy behind {the section} . . . With utmost clarity, Congress evinced its intent that section 1516 provide the exclusive remedy for American industry protests."). It is thus unreasonable to allow an importer to frustrate a domestic producer's only remedy to misclassification by bringing and then delaying resolution of an action at the CIT.

Because the above issues remain live, and because Wheatland retains a legally cognizable interest in their resolution in order to receive the response to which it is entitled under 19 U.S.C. § 1516 and 19 C.F.R. § 175, Wheatland's action is not moot and the court has jurisdiction over its claim for mandamus relief.

## IV.    THE COURT SHOULD GRANT WHEATLAND'S PETITION FOR A WRIT OF MANDAMUS

### A.    Customs Has a Clear Duty to Respond to Wheatland

After receiving a valid classification request, Customs had a ministerial duty to provide it. *See U.S. v. Schurz*, 102 U.S. 378 (1880) (holding that ministerial duties may be enforced by mandamus); *Timken Co. v. Simon*, 539 F.2d 221 (D.C. Cir. 1976) (finding that under Section 1516 Congress "enacted a detailed procedural scheme and mandated . . . the Secretary to perform a number of ministerial functions."). Wheatland followed the plain language of Section 1516 by

requesting the classification of designated imported merchandise: entries of steel conduit pipe made by Shamrock and Rymco after August 31, 2020.

Defendant argues that after receiving this request, Customs had no duty "to do anything more than to respond as it did through its January 2021 and April 2021 responses to Wheatland's submissions." Def. Br. at 36. That position rests on the mistaken premise that "Wheatland agreed with Customs' classification." *Id.* at 22*.* It did not. Instead of providing the classification for the designated imported merchandise, Customs first provided the classification for only a small subset of entries. *See* **Exhibit 1**. Subsequently, in its April 2021 letter, Customs apologized for being unable to provide the classification that Wheatland asked for, stating "{w}e regret that we cannot answer your specific questions regarding the entries of Shamrock and RYMCO." Compl., Exhibit 7, at 3. Customs then stated its "position" that merchandise meeting the general description of the designated imported merchandise should be "classified in heading 7306." Def. Br. at 22. But because misclassifications of the *designated* merchandise remain ongoing, any assertion that Customs' duty was extinguished by Wheatland's alleged agreement with Customs' "position" on *hypothetical* merchandise is unavailing. *Id*. Because Wheatland's classification request was proper, and because Wheatland continues to believe that the "classification . . . is not correct," Customs has a clear duty to "furnish the classification," to "determine the proper . . . classification," and to cause the merchandise to be classified in accordance with that determination. 19 U.S.C. § 1516(a)(1)-(b).

**B.   Wheatland Has a Clear Right to Demand the Relief Sought**

Defendant contests Wheatland's right to demand the relief sought by repeating its position that it already responded to Wheatland's December Request and January Petition, and by alleging that Wheatland "fail{ed} to discuss Customs' January 2021 and April 2021

responses, let alone why they were inadequate." Def. Br. at 37. Wheatland has explained in the above sections why Customs' responses were inadequate: Customs failed to furnish the classification of the designated imported merchandise, Customs failed to make a determination as to the correct classification of the merchandise, Customs failed to cause the merchandise to be classified in accordance with that determination, and Customs relied on a mistaken interpretation of Section 1516, 19 C.F.R. 177.7(b) and the Trade Secrets Act to avoid doing so.

Wheatland has fulfilled all of its obligations under Section 1516 to trigger these duties. It meets the requirements of an "interested party" under 19 U.S.C. § 1516(a)(2). *See* Pl. Writ, at 4. Its December Request was proper, because it correctly applied the plain language of Section 1516 to frame a request for the classification of designated imported merchandise – that is, specific entries by Shamrock and RYMCO during a designated period. Because it never received this classification, and because misclassifications of the merchandise remain ongoing, Wheatland "believes that . . .the classification . . . is not correct" (19 U.S.C. § 1516(a)(1)), and so Wheatland is entitled to demand a response to its December Request and January Petition.

### C. There Is No Adequate Alternative Remedy Available

"With utmost clarity, Congress evinced its intent that section 1516 provide the *exclusive remedy* for American industry protests." *Nat'l Corn Growers Ass'n,* 840 F.2d at 1553-54 (emphasis added). Customs attempts to evade this crystal-clear rule by alleging that Wheatland should instead wait for disposition of the Shamrock Action to resolve the classification of the merchandise. This requirement would completely frustrate the legislative intent behind Section 1516, which was to provide both domestic producers and importers with "certainty in the conduct of their affairs." *Id.* at 1553. If one party can delay a determination on classification by bringing an action at the CIT, there can be no certainty for other interested parties who are not

involved in that action – a fact recognized by the court in *Hitachi* when it warned of "unnecessary delay in the disposition of protests" if pending CIT actions could preclude Section 1516 protests by non-parties. *Hitachi Home Electronics*, 704 F.Supp.2d at n.2.

Defendant urges this reading of the statutory scheme by characterizing the wait for a decision in the *Shamrock Action* as a mere "delay{} inherent in the statutory process." Def. Br. at 37. This is not the case. As explained above, 19 C.F.R. § 177.7(b)—the regulation barring classification rulings when classification is at issue in a pending CIT action—does not apply to classification requests and petitions made under Section 1516 and its implementing regulations at 19 C.F.R. § 175. *See* 19 C.F.R. § 177.0. Regardless, it is unreasonable to believe that the exclusive remedy Congress provided for domestic producers to challenge a classification decision could be completely precluded by an importer's CIT action. Such an interpretation would leave domestic producers with no remedy at all during the pendency of the action. Wheatland's hands would be tied in that scenario, because under 28 U.S.C. § 2631(j)(1)(A), "no person may intervene in a civil action under section 515 or 516 of the Tariff Act of 1930." Indeed, it was the inability of domestic producers to intervene in protest proceedings initiated by an importer that prompted Congress in 1922 to pass Section 1516. *Nat'l Corn Growers Ass'n*, 840 F.2d at 1551.

Where a reasonable alternative interpretation is available, an agency's interpretation of a statute must be disregarded if it "'contravenes clearly discernible legislative intent'" (*DeCosta*, 987 F.2d at 1558) or "would lead to absurd results{.}" *Best Power Technology Sales Corp.*, 984 F.2d at 1175-76. Defendant's interpretation here would do both, and therefore its argument that awaiting disposition of the *Shamrock Action* could serve as an alternate remedy to seeking a classification determination must be rejected. Under binding precedent, and under any

reasonable interpretation of the statutory scheme, a Section 1516 response is Wheatland's

exclusive remedy. *See Nat'l Corn Growers Ass'n*, 840 F.2d at 1553-54.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny Defendant's motion to

dismiss Wheatland's complaint and instead grant Wheatland's petition for a writ of mandamus

compelling Customs to respond to Wheatland's December 11, 2020 request for information

under 19 U.S.C. § 1516(a)(1) and its January 7, 2021 petition for a tariff classification ruling

under 19 U.S.C. § 1516(a).

Respectfully submitted,

/s/ *Roger B. Schagrin*
Roger B. Schagrin
Luke A. Meisner
Nicholas J. Birch
Benjamin J. Bay
SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 719-7000

*Counsel for Wheatland Tube Company*

Dated March 9, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that these comments comply with the word count limitation of the U.S. Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 10,596 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I relied on the word count function of the word processing software used to produce this brief.

<u>/s/ Luke A. Meisner</u>

Dated: March 9, 2022

# EXHIBIT 1



OT:RR:CPMM H315573 KSG

January 22, 2021

Roger B. Schagrin
Schagrin Associates
900 Seventh Street, N.W.
Suite 500
Washington, D.C. 20001

rschagrin@schagrinassociates.com

RE:  Request for classification and rate of duty imposed upon imports of steel conduit pipe from Mexico, pursuant to 19 U.S.C.  § 1516(a)(1) and 19 C.F.R § 175.1

Dear Mr. Schagrin:

This is in response to your request, dated December 11, 2020, regarding the classification and rate of duty imposed upon imports of certain steel conduit pipe from Mexico, pursuant to 19 U.S.C. § 1516(a)(1) and 19 C.F.R § 175.1,on behalf of your client, Wheatland Tube Company.

U.S. Customs and Border Protection (CBP) liquidated entries of certain steel conduit pipe imported by Shamrock Building Materials, Inc. (Shamrock) between April 26, 2019, through July 19, 2019, inclusive, in subheading 7306.30.10, HTSUS, or in 7306.30.50, HTSUS, depending on whether the wall thickness of the pipe was less than 1.65 mm. The 2020 column one, general rate of duty for both subheadings is Free.

Shamrock filed an action in the Court of International (CIT), challenging the classification of its steel conduit pipe under those tariff provisions.  Therefore, the issue of the classification of the merchandise described above is now before the CIT in Shamrock Building Materials, Inc. v. United States, No. 20-00074, and will be adjudicated in that forum.

Sincerely,

ALLYSON R       Digitally signed by ALLYSON R
MATTANAH       MATTANAH
                Date: 2021.01.22 11:21:59 -05'00'   for
Craig T. Clark, Director
Commercial and Trade Facilitation Division

# EXHIBIT 2

# SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. · SUITE 500 · WASHINGTON, D.C. 20001
P: (202) 223-1700 RSCHAGRIN@SCHAGRINASSOCIATES.COM F: (202) 429-2522

February 22, 2021

**<u>Via Email and U.S. Mail</u>**
Allyson Mattanah
Branch Chief, Chemicals, Petroleum, Metals and Miscellaneous Articles
Regulations and Rulings, Office of Trade
U.S. Customs and Border Protection
90 K Street N.E., 10th Floor Mail Stop 1177
Washington, DC 20229-1177
<u>ALLYSON.R.MATTANAH@CBP.DHS.GOV</u>

> **RE:     Request for classification and rate of duty imposed upon imports of steel
> conduit pipe from Mexico pursuant to 19 U.S.C. § 1516(a)(1) and 19 C.F.R. §
> 175.1**

Dear Ms. Mattanah:

On behalf of Wheatland Tube Company ("Wheatland"), we write this letter to follow up on our December 11, 2020 request regarding the classification and rate of duty imposed upon imports of certain steel conduit pipe from Mexico, pursuant to 19 U.S.C. § 1516(a)(1) and 19 C.F.R § 175.1.  In particular, we write to ensure that U.S. Customs and Border Protection ("CBP") understands that Wheatland's request does not encompass the entries of certain steel conduit pipe imported by Shamrock Building Materials, Inc. ("Shamrock") between April 26, 2019, through July 19, 2019.  Rather, Wheatland's request encompasses entries of steel conduit pipe that were imported after August 31, 2020 and continuing to the present.

As outlined in greater detail in Wheatland's December 11, 2020 request, we are aware that CBP has previously addressed imports of conduit pipe from Mexico by Shamrock that were not properly classified under HTS 7306.30.  Those imports, which entered in the United States between April 26, 2019, and July 19, 2019, are ***not*** the subject of Wheatland's December 11, 2020 classification request.  Wheatland's classification request covers entries of steel conduit pipe made by Shamrock and RYMCO USA after August 31, 2020 – *i.e.*, the date that the U.S. Trade Representative announced that Mexico and the United States had agreed to establish a strict export monitoring regime for certain steel pipe products including steel conduit pipe.

In a letter dated January 22, 2021 regarding Wheatland's classification request, CBP stated the following:

> Shamrock filed an action in the Court of International (CIT), challenging the
> classification of its steel conduit pipe under those tariff provisions. Therefore, the issue of
> the classification of the merchandise described above is now before the CIT in <u>Shamrock</u>

Page 2 of 2
U.S. Customs and Border Protection
February 22, 2021

      <u>Building Materials, Inc. v. United States</u>, No. 20-00074, and will be adjudicated in that forum.[1]

To reiterate, Wheatland's classification request does not cover any of the entries covered by the action currently pending before the CIT in <u>Shamrock Building Materials, Inc. v. United States</u>, No. 20-00074.

      We therefore consider Wheatland's December 11, 2020 classification request to be still open and pending before the agency and respectfully request CBP to take further action on this matter.  To conclude, Wheatland's classification request only asks CBP to respond to  two simple questions:

1. Under what tariff classification have Shamrock's imports of steel conduit pipe been entered since August 31, 2020 to the present?

2. Under what tariff classification have RYMCO USA's imports of steel conduit pipe been entered since August 31, 2020 to the present?

Answering these two questions is a straightforward task for CBP to complete and does not in any way impact the litigation currently pending before the CIT in <u>Shamrock Building Materials, Inc. v. United States</u>, No. 20-00074.

      Please contact the undersigned with any questions regarding this submission.

      Respectfully submitted,

      *Luke A. Meisner*

      Roger B. Schagrin
      Elizabeth J. Drake
      Luke A. Meisner
      SCHAGRIN ASSOCIATES

      *Counsel to Wheatland Tube Company*

---

[1]     Letter from Craig T. Clark, Director, Commercial and Trade Facilitation Division, CBP (signed by Allyson R. Mattanah) to Roger B. Schagrin, Schagrin Associates (Jan. 22, 2021).

**EXHIBIT 3**

N306508

February 21, 2020

CLA-2-85:OT:RR:NC:N2:212

CATEGORY:    Classification

TARIFF NO.: 8547.90.0020

Hyunho Kim
SNT Steel, Inc.
1526 Katy Gap Road, Unit 701
Katy, TX 77494

RE:   The tariff classification of steel conduit pipe from Thailand

Dear Mr. Kim:

In your letter dated September 30, 2019, you requested a tariff classification ruling.

The merchandise under consideration is identified as EMT/UL797 white conduit tubing. You state that the tubes are made up of steel with an exterior coating of zinc and an interior coating of stoved epoxy resin. The tubes will be imported at various lengths and thicknesses. In use, the tubing will act as electrical wire conduit in both commercial and residential environments.

Samples were provided and sent to the CBP Laboratory for examination where testing concluded that the interior coating is made up of an organic resin compound, which would act as an electrical insulator. As the terms of heading 8547, Harmonized Tariff Schedule of the United States (HTSUS), dictate that conduit tubing classified therein must be electrically insulating, this office finds the subject goods are described accurately within the heading.

The applicable subheading for the EMT/UL797 whit conduit tubing will be 8547.90.0020, HTSUS, which provides for "Insulating fittings for electrical machines, appliances or equipment, being fittings wholly of insulating material apart from any minor component of metal…electrical conduit tubing and joints therefor, of base metal lined with insulating material: Other: Electrical conduit tubing and joints therefor, of base metal lined with insulating material: Conduit tubing." The general rate of duty will be 4.6% ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on the World Wide Web at https://hts.usitc.gov/current.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Luke LePage at luke.lepage@cbp.dhs.gov.

Sincerely,

Steven A. Mack
Director
National Commodity Specialist Division

# EXHIBIT 4

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SHAMROCK BUILDING MATERIALS, INC. | ) |
| Plaintiff, | ) |
| v. | ) Court No. 20-00074 |
| UNITED STATES, | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff, Shamrock Building Materials, Inc., by and through its counsel, hereby alleges and states as follows:

## NATURE OF THE ACTION

1.  Plaintiff challenges the denial by U.S. Customs and Border Protection ("CBP) of Protest Numbers 230419100397, 230419100514, 230419100671, 230419100672, and 230419100673, regarding the classification of certain electrical conduit imported by Plaintiff.

## JURISDICTION

2.  This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(a).

## THE PARTIES AND STANDING

3.  Plaintiff is the importer of record of the merchandise that is the subject of this action.

4.  Plaintiff is the person who filed the protests pursuant to Section 514 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1514, which were denied under Section 515 of the Tariff

1

Act of 1930, *as amended*, 19 U.S.C. § 1515, and are covered by this civil action; plaintiff thus

has standing to bring this action pursuant to 28 U.S.C. § 2631(a).

5.      Defendant United States, U.S. Customs and Border Protection ("CBP"), is the

party that denied the protest contested herein and is the statutory defendant under 28 U.S.C.

§ 2631(a).

6.      The protests covered by this action were timely filed with CBP at the port of entry

or the appropriate Center (Centers of Excellence and Expertise), which thereafter denied same.

7.      All liquidated duties have been paid.

## FACTUAL BACKGROUND AND DESCRIPTION OF MERCHANDISE INVOLVED

8.      The merchandise at issue is electrical metallic tubing finished conduit ("EMT"),

and intermediate metal conduit ("IMC") (collectively, "electrical conduit"), imported from

Mexico.

9.      Electrical conduit is used to route electrical wiring in a building or other structure.

10.     The electrical conduit at issue in this action consists of welded carbon steel tubing

that is galvanized on the exterior surface only.

11.     The interior surface of the electrical conduit is not galvanized, and instead is

coated with an insulating layer of organic epoxy enamel.

12.     The epoxy enamel coating is composed of epoxy resin, melamine resin, and

silicone additives, among other ingredients.

13.     Electrical conduit is typically installed in "runs" consisting of multiple pieces of

conduit that are connected as a raceway for electrical wiring.

14.     Runs of electrical conduit typically involve multiple bends that can be 90 degrees

or more.

15.     The electrical wiring within the runs of electrical conduit is subject to abrasion or other damage as it is "pulled" through these long runs due to the number of bends, the weld seams in the interior of the tube, ambient temperatures, and other installation conditions and practices.

16.     The interior epoxy enamel coating applied to Plaintiff's electrical conduit protects against damage to the wiring by providing an insulating layer between the wiring and the interior surface of the steel tube.

17.     The interior epoxy enamel coating insulates and protects the wire during installation into the conduit and afterwards during service.

18.     Damage to the electrical wiring during installation, such as abrasion or tears to the exterior coating of the electrical wire, can cause electrical short circuits.

19.     The interior epoxy enamel coating protectively insulates the wire against abrasion or tears by providing a barrier between the electrical wires and the interior steel wall of the tube that cushions the wire, and reduces friction.

20.     The interior epoxy enamel coating also provides electrical insulation to reduce the risk of electrical short circuits in the event of frayed or damaged wiring.

21.     The interior epoxy enamel coating resists the flow of electric charges by preventing or limiting the flow of electrons across the surface or through the volume of the coating material, thereby making the material difficult to ground.

22.     A short circuit cannot occur unless the electric charge goes to ground.

23.     If there is a frayed wire inside the conduit, the internal epoxy enamel coating will provide a barrier against the transfer of electrons to the applied surface.

24.     Plaintiff commissioned testing by G2MT labs, an ISO 9001 certified independent testing laboratory, on samples of electrical conduit coated with Plaintiff's interior epoxy enamel coating and comparable (in outside diameter and wall thickness) uncoated tubing.

25.     The laboratory performed three types of measurements to compare the coated electrical conduit and the uncoated tubing:  (1) abrasive force and abrasion damage, (2) thermal insulation properties, and (3) electrical insulation properties.

26.     The laboratory found that:  (1) the pull force required to pull a cable through tubing with four 90 degree bends was substantially less for the electrical conduit coated with the interior epoxy enamel coating in comparison to the uncoated tubing; (2) pulling a cable through the uncoated bent tubing resulted in much higher and deeper abrasion levels to the surface of the cable; (3) there was no statistically significant difference in thermal conductivity between the coated electrical conduit and uncoated tubing; and (4) there was a substantial increase in surface electrical resistivity of the electrical conduit coated with the interior epoxy enamel coating compared to the uncoated tubing.  A copy of the lab report, which was submitted to CBP with the protests, is attached to this complaint.

27.     Plaintiff sells its electrical conduit exclusively to electrical distributors and electrical contractors in the United States.

28.     Plaintiff's electrical conduit is clearly marked as EMT or IMC electrical conduit.

29.     Plaintiff's electrical conduit is installed in schools, hospitals, stadiums, restaurants, hotels, government office buildings, *etc.*, where electrical conduit is required.

30.     Plaintiff sells its electrical conduit in 10-foot lengths because the standard for the electrical industry in the United States is that electrical conduit be made and sold in 10-foot lengths which are easier to handle and bend, which is often done in the field/jobsite.

31.    The electrical conduit imported by Plaintiff was classified by CBP (depending on

wall thickness) either under subheading 7306.30.1000, HTSUS, as

> Other tubes, pipes and hollow profiles (for example, open seamed or welded,
> riveted or similarly closed), of iron or steel:
>> Other, welded, of circular cross section, of iron or nonalloy steel:
>> Having a wall thickness of less than 1.65 mm

or under subheading 7306.30.5028, HTSUS, as

> Other tubes, pipes and hollow profiles (for example, open seamed or welded,
> riveted or similarly closed), of iron or steel:
>> Other, welded, of circular cross section, of iron or nonalloy steel:
>>> *          *          *
>> Having a wall thickness of 1.65 mm or more:
>>> *          *          *
> Other
>>> *          *          *
>> Other:
>> With an outside diameter not exceeding 114.3 mm:
>> Galvanized:
>>> *          *          *
>> Internally coated or lined with a non-electrically insulating
>> material, suitable for use as electrical conduit.

32.    At the time the merchandise was imported, merchandise imported from Mexico

that was classified under subheadings 7306.30.1000 or 7306.30.5028 was subject to a 25 percent

duty imposed pursuant to section 232 of the Trade Expansion Act of 1962, *as amended*,

19 U.S.C. § 1862.

33.     Plaintiff claims that the imported merchandise should be classified under

subheading 8547.90.0020, HTSUS, as

> Insulating fittings for electrical machines, appliances or equipment, being fittings
> wholly of insulating material apart from any minor components of metal (for
> example, threaded sockets) incorporated during molding solely for the purposes
> of assembly, other than insulators of heading 8546; electrical conduit tubing and
> joints therefor, of base metal lined with insulating material:

> > *          *          *

> Other

> > *          *          *

> Electrical conduit tubing and joints therefor, of base metal lined with
> insulating material:

> > Conduit tubing

34.     At the time of importation, merchandise from Mexico classified under subheading

8547.90.0020 was not subject to section 232 duties and was duty free under the North American

Free Trade Agreement ("NAFTA").

35.     The 25 percent section 232 duty on imports of steel products from Mexico,

including merchandise classified under 7306.30.1000 or 7306.30.5028, was in effect from

June 1, 2018 through May 19, 2019.

36.     On August 27, 2018, CBP issued a Form 28 request for information ("RFI") to

Plaintiff requesting that it provide information and supporting documentation to demonstrate that

Plaintiff's imported EMT finished conduit in two selected entry summaries are products of

Mexico that are eligible for the preferential tariff treatment claimed under NAFTA.

37.     On October 5, 2018, Plaintiff responded to the August 27, 2018 RFI and provided

purchase orders, commercial invoices, and mill certificates from the Mexican producer and

exporter of electrical conduit, as well as sample invoices from the suppliers of the materials that

are used to produce the electrical conduit in Mexico, demonstrating that all of the inputs were

produced and sourced in Mexico, and thus that all of the components of the imported electrical conduit are "originating goods" that are "are goods wholly obtained or produced entirely in the territory of . . . Mexico" pursuant to 19 C.F.R. § 181.1(q) and General Note 12(b)(i) of the U.S. Harmonized Tariff Schedule.

38.     On November 15, 2018, CBP informed Plaintiff's counsel via email that the NAFTA origin issue was closed and that the merchandise qualified under NAFTA.

39.     On October 9, 2018, CBP issued a second RFI to Plaintiff requesting that Plaintiff "{p}rovide justification and rational{e} to classify that electrical metallic tubing (EMT) coated with epoxy enamel is insulated conduit HTSUS Tariff 8547.90.0020."  The RFI stated that "{t}here appears to be no insulation properties to the epoxy enamel organic coating" and that "there appears to be no indication that the epoxy enamel insulates the EMT conduit from thermal, heat, or electrical voltage."

40.     While Plaintiff's response to the October 9, 2018 RFI was pending, on October 31, 2018, CBP issued a Form 29 Notice of Action that a rate advance action had been taken on 159 entries of Plaintiff's imports of finished conduit from Mexico, including entries in the denied protests being challenged in this action.  CBP stated that "{u}pon examination of CBP obtained samples from this entry {*i.e.*, 8NV-00282653}, and entry 8NV-00282408, it was determined {that} there were no insulation properties of the organic coating inside the electrical conduit."  The Notice of Action further advised that CBP had determined that "a more appropriate classification" for the imported merchandise was subheading 7306.30.5028.

41.     On November 1, 2018, Plaintiff responded to the October 9, 2018 RFI.  In its response, Plaintiff provided a detailed explanation of the physical characteristics of the interior epoxy enamel coating and an explanation as to why its electrical conduit is properly classified

under subheading 8547.90.0020. Plaintiff included in its response to CBP a letter from its supplier of the interior epoxy enamel coating that identified the primary materials in the interior epoxy enamel coating and explained that such materials are widely used in the formulation of insulating varnishes and resins and that with proper application the epoxy enamel forms a protective insulating coating over the underlying material.

42. On November 5, 2018, CBP issued another RFI requesting that that Plaintiff "provide the industry specification(s) that your product is conforming too {sic} in regards to electrical, heat, and/or thermal insulative properties of imported conduit. Please include all physical values (i.e. electrical resistivity of coating, coating thickness, etc.) that are required to meet the cited specifications."

43. On December 4, 2018, Plaintiff responded to the November 5, 2018 RFI. In its response, Plaintiff reiterated the explanation provided in the November 1, 2018 response and also provided CBP with a copy of its product brochure for EMT electrical conduit, noting that the brochure states that the interior coating serves to insulate the wall of the conduit tube and that one of the benefits of the product is to make it fire resistant.

44. On December 6, 2018 CBP sent additional questions to Plaintiff via email, requesting clarification as to whether "the EMT conduit {is} {i}nternally coated or lined with a non-electrically insulating material, suitable for use as electrical conduit," or "{i}f the coating is of electrically insulating material, . . . {p}lease include all physical values (i.e. electrical resistivity of coating, coating thickness, etc.) that are required to meet the cited specifications," claiming that Plaintiff's December 4, 2018 response to the November 5, 2018 RFI had not included that information. CBP also had questions about the interior coating of samples previously provided that indicated no recognition or understanding of the explanations regarding

the interior epoxy enamel coating provided in Plaintiff's November 1, 2018 and December 4, 2018 responses, and requested additional samples.

45.     On December 7, 2018 Plaintiff responded to the December 6, 2018 email, reiterating its explanations that the electrical conduit "is <u>finished conduit</u> that is <u>internally coated with an electrically insulating material</u>, i.e., the epoxy material discussed at length in" Plaintiff's December 4, 2018 response.  Plaintiff further reiterated that it was unaware of any specification or industry requirement for electrical resistivity or of any minimum requirements for electrical, thermally or protective insulative properties required for compliance with Harmonized Commodity Description and Coding System Explanatory Note 85.47 (B) or the description in subheading 8547.90.00, HTSUS, that applies to electrical conduit, and again elaborated on the detail provided in its December 4, 2018 response.  Plaintiff also sent the additional samples requested.

46.     On December 21, 2018, CBP issued another Form 29 Notice of Action again advising Plaintiff that CBP had concluded that the more appropriate classification for Plaintiff's entries of finished conduit is 7306.30.5028, and instructed Plaintiff to use this classification for all current and future entries.

47.     Between April 26, 2019 and July 19, 2019, CBP liquidated the 201 entries which are the subject of this action.

48.     Plaintiff filed protests against the liquidations, which were subsequently denied by CBP.

## COUNT I

49.     Plaintiff incorporates by reference paragraphs 1-48 of this Complaint.

50.     Plaintiff's finished electrical conduit is properly classified under subheading 8547.90.0020 as electrical conduit tubing of base metal lined with insulating material.  The interior epoxy enamel coating applied to the finished electrical conduit constitutes "insulating material" within the meaning of subheading 8547.90.0020 because the coating provides electrical insulation by constituting a barrier against the transfer of electrons to the interior metal surface of the pipe, thereby increasing the electrical resistivity of the conduit.

## COUNT II

51.     Plaintiff incorporates by reference paragraphs 1-50 of this Complaint.

52.     Plaintiff's finished electrical conduit is properly classified under subheading 8547.90.0020 as electrical conduit tubing of base metal lined with insulating material.  The interior epoxy enamel coating applied to the finished electrical conduit constitutes "insulating material" within the meaning of subheading 8547.90.0020 because the coating insulates the electrical wiring by providing physical protection against abrasion or other damage to the wiring by offering cushioning and reduced friction.

53.     CBP has previously ruled that stainless steel tubing with an interior teflon coating that insulates and protects the wiring is properly classified under subheading 8547.90.0020.  CBP has also ruled that connectors are properly classified under subheading 8547.90.0030 where they are coated with a thermoplastic insulator that protects the electrical connectors from abrasion as they emerge from the conduit raceway.  Nothing in these rulings indicates that it is necessary to demonstrate that the insulating material is electrically insulating, as distinct from material that is

physically insulating, in order to qualify as "insulating material" within the meaning of subheadings 8547.90.0020/30.

54.     Explanatory Note 85.47 (B) states that "{t}his group covers the metallic tubing used in permanent electrical installations (e.g., house wiring) as insulation and protection for the wire, provided it has an interior lining of insulating material."  Nothing in the description of the subheading, or in this Explanatory Note, limits the definition of "insulating material" to only material that is electrically insulating, as distinct from material that is protectively insulating.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court render judgment that the

imported merchandise at issue is properly classifiable as claimed by Plaintiff in subheading

8547.90.0020, HTSUS, order reliquidation of the entries covered by this civil action with a

refund of duties plus interest as provided by law, and grant such other and further relief as the

Court shall deem just and proper.

<div style="margin-left:50%">

Respectfully submitted,

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4817

/s/ Donald B. Cameron, Jr.
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer

**SANDLER TRAVIS & ROSENBERG, P.A.**
551 Fifth Avenue, Suite 1100
New York, NY 10176
(212) 549-0150

/s/ Michael S. O'Rourke
Michael S. O'Rourke
Patrick D. Gill

</div>

Dated:  May 20, 2020

<div style="margin-left:50%">

*Counsel to Shamrock Building Materials, Inc.*

</div>

12

**Attachment**

**Report: SHA 19001**
**Insulated vs. Uncoated EMT Tube Testing**

**Submitted To:**

Adam Marty Shamrock Steel

**Submitted By:**

Joshua Jackson, PhD G2MT Labs
5401 Mitchelldale, Suite A-3 Houston, Texas 77092

**April 30, 2019**

*Disclaimer: The results of this report are based on the evidence that has been received and reviewed. G2MT has the right to modify results if further evidence comes forth.*

## 1. Introduction

G2MT Laboratories, LLC was requested to perform a series of tests to evaluate the properties of an inner diameter (ID) coating on EMT conduit for Shamrock Steel. The tests included a wire abrasion testing, pull-force testing to measure the force required to pull the wire through the conduit, a heat transfer rate test, and electrical resistivity testing.

## 2. Abrasive Force and Abrasion Damage

Testing to compare the pulling force, abrasion damage, and wear of the insulated and uncoated samples was performed by pulling a 12-gage wire through two otherwise identical conduit samples which were insulated and un-coated. The 10' insulated and uncoated conduit samples were bent identically in four ninety-degree bends to create a number of corners around which the wire had to travel. Force testing was performed utilizing a Mark-10 force gauge, which was attached the end of the cable (a new sample was used for each test) as it was pulled through the bent fixture. A 36% increase in the required force was measured between the insulated and uncoated conduit, as seen by the data in Table 1.

For abrasion/wear testing, two separate lengths of 12-gage wire were fed 20 times through the bent conduit fixtures. Samples were then removed at the same location from each wire, and the surfaces of each wire were examined under a scanning electron microscope (SEM) to determine the degree of abrasion damage and wear.

## 3. Thermal Insulation Properties

Thermal insulation testing was performed utilizing a 300-watt heat source which was inserted inside the tube. Care was taken to ensure the same placement within the tube for each sample. The outer temperature was measured using a K-type thermocouple each minute as the temperature increased as seen in Table 2, and the time to reach a temperature of 250 degrees Fahrenheit was recorded. Only a minimal difference was observed in the temperature increase rate, indicating that not substantial thermal insulation provided by the insulated product.

## 4. Electrical Insulation Properties

Due to the shape of the pipe, the electrical insulation was measured on a 3" x 3" section of pipe using a laboratory Agilent E4980A (due for calibration again on 02-06-2020) to determine electrical resistance of the coating via 4-point resistivity measurements and a Fluke 87 multimeter (also due for calibration next on 02-06-2020) for 2-point resistivity measurements. For the four-point electrical measurements, the uncoated pipe exhibited an electrical resistance of 2.5-3.0 milliohms, while the coated pipe exhibited an electrical resistance that ranged between 70-120 milliohms depending on the location of the probes. For two-point resistivity testing, the uncoated pipe measured a resistivity of 0.2 ohms and the insulated pipe was 0.7-1.2 ohms. Both measurements indicate a substantial increase in the electrical resistivity of the insulated pipe compared to the uncoated pipe.

## 5. Electron Microscopy

Scanning electron microscopy (SEM) was utilized to examine the damage on the outer surface of the cable. After abrasion testing, the wire samples were examined using Scanning Electron Microscopy to characterize the degree of damage to the coating. The insulated pipe produced much lower levels of abrasion and deposition on cable when compared to uncoated pipe. First, the as-received cable is shown in various magnifications in Figure 1. The cable after being pulled through the insulated pipe 20 times is shown in Figure 2; only moderate surface scratching and abrasion was observed. Another identical length of the same cable after being pulled through the uncoated pipe is shown in Figure 3; much deeper and more extensive scratching is observed on the cable, along with deposits of rust and other debris that can from the uncoated pipe.

## 6. Discussion

- The abrasion caused by the insulated pipe covers approximately 25% of the surface of the cable.
- The abrasion from the uncoated pipe covers around 70% of the cable and is deeper, with a much heavier amount of deposited residue and particulate observed.
- The insulated pipe provides a higher electrical resistance than an uncoated pipe.
- No statistically significant difference was observed in thermal conductivity of the 4" tubing with or without an insulated interior.
- The pull force required to pull the cable through a testing arrangement was substantially less for the insulated conduit.

| Table 1: Force Required to Pull Wire Sample Through a 10 Ft. Tube Sample | | | | | | |
|---|---|---|---|---|---|---|
| Sample | Test #1 | Test #2 | Test #3 | Test #4 | Test #5 | Average |
| Coated | 3.0 | 2.5 | 2.5 | 2.5 | 2.5 | 2.6 |
| Uncoated | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 |

| Table 2: Rate of Heat Transfer | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Sample** | 0 Min. | 0.5 Min. | 1 Min. | 2 Min. | 5 Min. | 8 Min. | 10 Min. | 15 Min. | 20 Min. |
| **Coated** | 77.4F | 95.8F | 108.2F | 140.4F | 213.8F | 268F | 290.8F | 316F | 318.4F |
| **Uncoated** | 77.4F | 90.9F | 107.4F | 135.6F | 207.4F | 257.8F | 278.2F | 299.6F | 317.6F |



15.0kV 9.1mm x350 BSE3D 3/20/2019                    100um

*Figure 1: Scanning electron microscopy showing the condition of the As-received wire surface at 350X magnification.*



10.0kV 8.8mm x350 BSE3D 3/21/2019                         100um

*Figure 2: Scanning electron microscopy showing the condition of the wire tested with the insulated pipe at 350X magnification.*



10.0kV 8.6mm x350 BSE3D 3/21/2019                    100um

*Figure 3: Scanning electron microscopy showing the condition of the wire tested with the uncoated pipe at 350X magnification.*